### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**U.S. SPECIALTY INSURANCE
COMPANY,**

                         **Plaintiff,**

**-vs-**                                              **Case No.  6:09-cv-231-Orl-31KRS**

**WILLIAM G. BURD and TEW
CARDENAS, LLP,**

                         **Defendants.**
_____

## MEMORANDUM OPINION

        This is a legal malpractice case brought by U.S. Specialty Insurance Company ("USSIC")

against William G. Burd and his former law firm, Tew Cardenas, LLP.[1]  On January 27, 2011, the

Court denied Burd's Motion for Summary Judgment.  (Doc. 87.)  At a subsequent pretrial

conference on March 11, 2011 (Doc. 108), the parties agreed to try the duty issue as a matter of

law before me at a bench trial, which took place on May 16 through 17, 2011.  At that trial, the

Court heard testimony and admitted documentary evidence.  Afterwards, the Court reviewed the

trial transcript, deposition designations, exhibits and briefs submitted by the parties.  (Doc. Nos.

152 and 153.)  This Opinion seeks to resolve the legal issue of whether Burd had a duty of

professional care running to the insurer, USSIC.

_____

        [1] The Defendants will be collectively referred to as "Burd."

**I. Facts**[2]

Valiant Air Command ("VAC") is a war bird museum in Titusville, Florida.  (*See* Tr. at 1-41:1-11.)  Its commander is Lloyd Morris.  On May 7, 2005, parts were being removed from a derelict DC-3 aircraft when the aircraft fell, killing Michael McDonough (age 76) and seriously injuring Joshua Payne (age 15).  VAC was insured by USSIC under an airport premises liability policy with limits of $1,000,000.00.  (*See* Ex. 151.)

Charles Taylor Consultants ("CTC") was USSIC's claims administrator for aviation claims in Florida and served as the adjusting agent for USSIC in this matter.  Robert Porter was the CTC adjuster who handled the day-to-day activities and Edward Copley was his supervisor.  Paul Leonard served as CTC's Chief Executive Officer.

On May 26, 2005, Copley sent an e-mail to Burd, asking him to run a conflicts check.  (Ex. 48.)  Shortly thereafter, Burd advised Copley that he had no conflicts (Ex. 49), and on May 31, 2005, Burd was retained by USSIC to defend VAC against claims arising from the accident.  (Ex. 50.)  Two weeks later, Copley e-mailed Burd handling instructions, telling him to simply monitor the matter for the time being.  (*See* Ex. 53.)[3]

_____

[2] The following facts presented at trial are undisputed or found by the Court.

[3] Specifically, Copley's June 13, 2005 e-mail provided in pertinent part:

> As you know, USSIC decided to retain your services at this early stage due to the facts looking rather bad for the insured and the complexities brought on by multiple claimants. For now, USSIC would like you to simply monitor this matter.  I will continue to forward you updates as they occur. With this approach, you will be up to speed should matters turn ugly, while avoiding getting everyone excited by introducing an attorney into the mix at this early stage.  This approach is believed to be in the best interests of the insured. Please advise if you or the insured do not concur.

Burd abided by Copley's instruction to lay low because for the next ten months he communicated almost exclusively with CTC. Specifically, Morris recalled only one phone call with Burd about eight months to a year after the incident (Tr. 1-45-57),[4] and one meeting in September 2005.[5] Burd claims that he also communicated with Jerry Trachtman, VAC's general counsel. (Tr. at 1-118:16-119:4; 1-121:1-3; 1-186:21-191:8.) However, neither Trachtman's nor Burd's time records corroborate this and Trachtman recalled only one conversation with Burd before Payne filed suit against VAC. (*Id*. at 2-7:6.)[6]

The decision to hire Burd was made by Robert Haire, USSIC's Claims Manager, on May 26, 2005. (Tr. at 2-43:14-23.) According to Haire, Burd was hired to represent USSIC because a Florida lawyer was needed to assist USSIC with the difficult process of resolving multiple claims that likely would exceed VAC's policy limit. (Haire Dep. at 66:7-12; 70:23-71:21.) But Copley, who actually hired Burd, did not see it that way. Rather, as stated in Copley's May 31, 2005 retention letter, Burd was retained "on behalf of [USSIC], for the purpose of assisting and defending [VAC] against claims arising from the above reference accident, pursuant to the provisions of the applicable USSIC insurance policy." (Ex. 51.) This was also corroborated by

---

(Ex. 53.)

[4] According to Burd's time sheets, this telephone conference occurred on April 18, 2006. (*See* Ex. 134.)

[5] Although Morris could not remember the exact date on which Burd came to VAC, he admitted that he does not have any reason to question Burd's memory of the specific date of his visit. (Tr. at 1-54:2-55:7.) Burd testified that it was in September 2005. (*Id*. at 1-207:2-8.)

[6] Burd's time sheets reflect a telephone call with Trachtman on October 25, 2005. (*See* Ex. 66.)

an entry in USSIC's internal computer system.  (*See* Ex. 68.)[7]  Haire claims Copley's May 31,

2005 letter was inartfully drafted  (Haire Dep. at 119:13-21), but all the other participants agree

with Copley.

On March 16, 2006, CTC offered Payne's counsel $850,000.00 to settle the Payne claim

against VAC.  (Ex. 80.)  Less than a week later, Payne's counsel rejected that offer and advised

CTC that $1,000,000.00 would not be enough to settle the claim.  This prompted Copley to write

an excess letter to VAC dated March 29, 2006. (Ex. 17.)  Burd followed up on April 3, 2006, with

his first written communication to VAC, advising Morris of his retention to represent VAC[8] and

enclosing the Statement of Insured's Clients Rights as required by The Florida Bar.  (Ex. 83.)[9]

Payne's lawyers filed suit against VAC in September 2006.  Burd responded on October

12, 2006, with a letter to Payne's counsel professing surprise that suit had been filed because he

thought an agreement had been reached to settle the case in August.  (Ex. 85.)  Payne's counsel

---

[7] Specifically, on May 26, 2005, Copley's time sheet contains the following entry: "[p]er instructions, atty Burd has been retained to represent [VAC]."  (Doc. 68.)

[8] In a subsequent e-mail, Haire noted that "Burd was formally retained for the defense of the insured" in the Spring of 2006.  (Ex. 89.)

[9] This Statement is required by the rules regulating lawyer conduct in Florida.  As set forth in Rule 4-1.8(j):

> When a lawyer undertakes the defense of an insured other than a governmental entity, at the expense of an insurance company, in regard to an action or claim for personal injury or for property damages, or for death or loss of services resulting from personal injuries based upon tortious conduct, including product liability claims, the Statement of Insured Client's Rights shall be provided to the insured *at the commencement of the representation*.

R. Regulating Fla. Bar 4-1.8(j) (emphasis added).

responded the next day with a letter claiming bad faith on USSIC's part, because USSIC had only offered $850,000.00 on a claim that was clearly worth more than $1,000,000.00.  (Ex. 110.)

On October 18, 2006, Burd wrote Payne's counsel accusing them of engaging in "revisionist history," and reiterated USSIC's offer to settle for $1,000,000.00, subject to getting a release from the McDonough estate.  (Ex. 113.)  On October 24, 2006, Burd wrote Copley a letter summarizing Florida law on an insurer's obligations regarding claims settlement where there are multiple claimants and the policy limits are potentially inadequate to settle all the claims.  (Ex. 90.)

In April 2009, USSIC settled with Payne for $9,000,000.00 pursuant to a settlement agreement.

## II. Analysis

USSIC claims that Burd owed it a duty of professional care.  Burd demurs with the contention that no privity of contract existed between USSIC and Burd because Burd was VAC's lawyer; and, absent privity, no duty exists.  *See Espinosa v. Sparber, et al*, 612 So. 2d 1378, 1379 (Fla. 1993) ("An attorney's liability for negligence in the performance of his or her professional duties is limited to clients with whom the attorney shares privity of contract.").  USSIC counters with the argument that under Florida law, there is privity between the insurer and the lawyer retained to represent the insured, even if Burd were hired solely to defend VAC.  (*See* Doc. 152 at 5.)  Moreover, USSIC contends that it has third party beneficiary status to bring suit against Burd.  (*Id*. at 17.)  The case law in Florida supports USSIC's contentions.

In *Nova Casualty Co. v. Santa Lucia*, No. 8:09-cv-1351-T-30AEP, 2010 WL 3942875 (M.D. Fla. Oct. 5, 2010), Nova sued Robert Santa Lucia for his negligence in defending an

underlying tort claim against Nova's insured.  Judge Moody's succinct opinion is worth repeating here:

> Under Florida law, an attorney's liability is limited to those with whom the attorney is in privity of contract or intended third party beneficiaries of the attorney-client relationship.  Here, the insurance carrier, Nova, has a cause of action for three reasons.  First, Nova has a direct cause of action against Defendants.  The Florida Bar rules allow the same attorney to represent both the insured and the insurer at the same time.  It was Nova that selected and retained Santa Lucia.  And it was Nova that was responsible for paying Santa Lucia for his work.  Therefore, Nova was in privity of contract with Santa Lucia.
>
> Second, Nova is a third party beneficiary of Santa Lucia's representation of the insured.  Florida courts have allowed beneficiaries of wills to bring [and] maintain malpractice claims against the attorneys who prepared the wills.  This case is a close analogy to the will drafting cases.  Nova has a contract with the insured, which gives the insurer the duty to provide a defense.  This duty includes the right of the insurer to select and the duty to pay counsel.  That relationship makes Nova an obvious third party beneficiary.
>
> Finally, by satisfying the liability claim against its insured, the insurance carrier steps into the shoes of the insured through equitable subrogation to sue a liable torfeasor.

*Id.* at 2 (internal citations omitted); *see also Hartford Ins. Co. v. Koeppel*, 629. F. Supp. 2d 1293 (M.D. Fla. 2009).

It is thus clear that under Florida law, a tripartite relationship normally exists between the insurer, the insured, and the lawyer retained to represent the insured.  This relationship is expressly recognized by The Florida Bar's rules regulating lawyer conduct.  *See* R. Regulating Fla. Bar 4-1.7(e).  The comments to that rule recognize that the lawyer may represent both the insurer and the insured "in the absence of a disqualifying conflict of interest."  *Id.* at 4-17 cmt.

The nature and extent of Burd's communications with USSIC prior to the end of 2006 suggest the existence of a tripartite relationship.[10]   However, Burd contends that certain conflicts existed which precluded his representation of and consequent duty to USSIC.   These alleged conflicts are the heart of the duty issue.   Burd asserts two conflicts which would defeat any obligation owed by him to USSIC.[11]   These alleged conflicts will be addressed in turn.

First, Burd relies on *R.C. Wegman Construction Co. v. Admiral Insurance Co.*, 629 F.3d 724 (7th Cir. 2011), for the proposition that, once an excess judgment becomes a nontrivial probability, a conflict arises which throws the interests of the insurer and the insured out of alignment. *Id.* at 728, 730.   Since the possibility of an excess judgment was a significant concern from the outset of this case, Burd contends that a conflict existed which precluded his representation of USSIC.   However, an examination of *Wegman* and the other cases cited by Burd in footnote 33 of its brief, together with Burd's conduct, do not support the application of this general principle to the facts of this case.

*Wegman* was a bad faith claim under Illinois law.   Admiral had issued a $1,000,000.00 liability policy to Wegman. 629 F.3d at 725.   Brian Budrik sued Wegman for injuries he sustained in a fall while working at a construction site managed by Wegman and recovered a verdict in excess of $2,000,000.00.  *Id*.   Wegman had an excess policy of $10,000,000.00, but Admiral never notified Wegman that an excess judgment was possible until a few days before trial.  *Id*. at 727.

---

[10]Attached hereto as Appendix A is a summary of Burd's actions from May 2005 to October 2006.

[11] A third assertion relating to a mis-description of VAC's business on the policy's declaration page is trivial and was not addressed in Burd's brief.   The Court, therefore, considers this claim to have been abandoned.

The excess carrier therefore denied coverage for untimely notice. *Id*. Thus, Wegman sued Admiral for failing to advise it of the possibility of an excess verdict, which caused Wegman to lose its excess coverage and incur an additional $1,000,000.00 loss. *Id*.

The ruling of the court in *Wegman* was rather simple – an insurer has a duty of good faith to keep its insured informed. *See id*. at 729-30. The case did not involve the lawyer's duty of care or any conflict that would affect the lawyer's duty to Admiral or Wegman.[12] Indeed, the court assumed that the lawyer had a duty to inform Admiral about the excess exposure so that Admiral could so inform its insured. In this context, the *Wegman* opinion is of little relevance to the issue presented here.

Similarly, the other cases cited by Burd do not support his position.

In *Paradigm Insurance Co. v. Langerman Law Offices, P.A.*, 24 P.3d 593 (Ariz. 2001) (hereinafter "*Paradigm II*"),[13] Paradigm issued an insurance policy covering Dr. Benjamin Vanderwerf. Vanderwerf and Samaritan (his employer) were sued for medical malpractice by Renee Taylor. *Id*. at 594. Paradigm assigned defense of the case to Langerman. *Id*. In the course of defending the claim, Langerman allegedly committed legal malpractice by failing to discover that Samaritan had primary insurance coverage. *Id*. at 594-95. Thus, although the Taylor claim

---

[12] Wegman filed a separate malpractice action against the lawyer hired by Admiral to defend Wegman in the Budrick suit. The court noted that Admiral may have a right of indemnification from the lawyer if the lawyer had failed to inform Admiral of the risk of excess liability. *Wegman*, 629 F.3d at 731.

[13] In his brief, Burd relies on the Court of Appeals of Arizona's decision in *Paradigm Insurance Co. v. Langerman Law Offices, P.A.*, 2 P.3d 663 (Ariz. App. Div. 2001). However, that opinion was vacated in part by the Arizona Supreme Court. Specifically, the Arizona Supreme Court disagreed with the appellate court's conclusion that a lawyer automatically represents both the insurer and insured until a conflict actually arises. *Paradigm II*, 24 P.3d at 599. For purposes of this Memorandum Opinion, the Court relies on the decision by the Arizona Supreme Court.

was settled within Paradigm's limits, Paradigm lost the ability seek contribution or indemnification from Samaritan's insurance company.  Accordingly, Paradigm refused to pay Langerman and litigation ensued between them.  *Id.* at 595.  Langerman claimed that he represented Vanderwerf and not Paradigm and, therefore, had no duty to Paradigm.  *Id.*  The Arizona Supreme Court held that the absence of an express contract between Paradigm and Langerman was not determinative and that the mere potential for conflict does not relieve the lawyer from his duty to the insurer. *Id.* at 595-599.  As stated by the Court:

> When the interests of insurer and insured coincide, as they often do, it makes neither economic nor practical sense for an insurer to hire another attorney to monitor the actions and decisions of the attorney assigned to an insured.  More important, we believe that a special relationship exists between the insurer and the counsel it assigns to represent the insured.

*Id.* at 601.

*In re Petition of Youngblood*, 895 S.W. 2d 322 (Tenn. 1995), was an opinion by the Tennessee Supreme Court regarding an ethics opinion issued by the Tennessee Board of Professional Responsibility.  The court found error in the Board's conclusion that a conflict of interest was implicit if the insured's lawyer was an employee of the insurer.  *Id.* at 327-330.  The court noted that while the employer-employee relationship creates the potential for a conflict, the question is whether there is a "reasonable probability of a real conflict."  *Id.* at 328 (internal citations omitted).  And, whether a lawyer can fairly and adequately protect the interests of multiple clients (insurer and insured) depends upon an analysis of each case. *Id.* at 330.

Burd also cites to *Emons Industries, Inc. v. Liberty Mutual Insurance Co.*, 749 F. Supp. 1289 (S.D. N.Y. 1990).  In that case, extended coverage litigation had resulted in a settlement

agreement whereby the insurer agreed that it would compensate counsel selected by the insured. *Id*. at 1290. Subsequently, the insurer refused to pay insured's counsel and the insured brought suit for injunctive relief. *Id*. at 1291. The court granted the relief, based on the prior settlement agreement and noted, *in dicta,* that when a conflict exists (as it did here), the insured is entitled to select its counsel, whose reasonable fee is to be paid by the insurer. *Id*. at 1297.

Thus, it can be seen that none of the cases relied upon by Burd stand for the proposition that the mere prospect of an excess judgment, by itself, necessarily disqualifies counsel from his dual representation of the insurer and the insured. Rather, as noted by *Couch on Insurance*, "[t]he determination of whether there is a conflict of interest is extremely fact specific." 14 G. Couch, Cyclopedia of Insurance Law § 202:23 (3d ed. 2005). "The fact that the damages requested by the plaintiff in the underlying tort litigation exceed the limits of the insurance policy does not generally amount to a conflict of interest sufficient to require appointment of independent counsel." *Id*. at § 202:30.

The general rule as stated in the context of this case is that, absent consent, a lawyer may not represent a client (USSIC) if there is a <u>substantial risk</u> that the lawyer's representation of the client would be materially and adversely affected by the lawyer's duties to another current client (VAC). *See* Restatement (Third) of the Law Governing Lawyers § 121 ("A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person.") An economic conflict occurs when the financial interests of the insurer and insured diverge. This typically happens when the insured, facing an excess claim, wants the policy limits offered in order to head off an excess judgment, but the

insurer is reluctant to do so in the belief that the claim is not worth the policy limit.  In this situation, it can be seen that the interest of the insurer in saving money is at odds with the insured's interest in preventing an excess judgment and, thus, a conflict arises.

There was no such conflict here because everyone involved knew early on that the value of the claims exceeded the $1,000,000.00 policy limit.[14]  Indeed, Burd's counsel admitted during his opening that "everyone knew that a million dollars was not going to get all the losses covered" (Tr. 1-18); and that the interests of the insured and insurer were parallel in this regard.  (*Id*. at 1-

---

[14] Specifically, Trachtman testified that when Burd first called him several months after the incident to ask him for advice, Trachtman responded by stating, "I think you should tender the policy limits yesterday."  (Tr. at 2-8:12-17.)

On May 13, 2005, Porter recommended setting the initial reserve at $1 million.  (Porter Dep. at 27:17-28:20.)  Thereafter, on May 20, 2005, Copley made the following entry in CTC's internal computer system: "[r]ecommend raising reserves to policy limits of $1 million."  (Ex. 68.)  Haire set a $1,000,000.00 reserve (the policy limit) on May 24, 2005, before Burd was hired.  (*See id*.); (*see also* Ex. 46).  In his deposition, Haire testified that all parties knew early on that it was a limits scenario. (Haire Dep. at 130:7-9.)

Similarly, Copley testified that at the time USSIC retained Burd, it was USSIC's and CTC's goal to "get the claim settled within the reserve amount or the policy limits."  (Tr. at 2-48:4-8.)  Copley further agreed that by May 25, 2005, "it was obvious to everyone that the limits needed to be posted."  (*Id*. at 2-66:3-5.)

Burd testified that he knew from the outset that, at least potentially, "this was going to be an excess liability case."  (*Id*. at 1-133:1-3.)  On August 1, 2005, Copley sent an e-mail to Burd informing him that, "as you know, limits are available."  (Ex. 99.)

23).[15]   The problem was not how much to pay, but rather how to pay it in such a way as to

_____

[15] During cross-examination, USSIC's counsel elicited the following testimony from Copley:

Q:      Do you know, in fact, that the suit wasn't filed until September 7th of '06, correct sir?

A:      That sounds about right.

Q:      Okay.  So at that point in time the mission was "Let's get this thing settled," right?

A:      Right.

Q:      And you had wanted to get it settled for within policy limits, obviously, correct, sir?

A:      Right, as with every claim.

Q:      And USSIC, in fact, authorized you to hire Mr. Burd to help you out, accomplish that objective, correct?

A:      Could you say that again.

Q:      Yes.  At that point in time the mission was to get the case settled?

A:      Right.

Q:      Or within policy limits, right?

A:      Correct.

Q:      Nobody wants an excess verdict, not the insured, not the insurance company, isn't that correct?

A:      That's correct.

Q:      There's a complete identity of interest as far as that goes, isn't that correct?

A:      Nobody wanted that at that time.

maximize the benefit to the insured.

The second conflict urged by Burd relates to a policy exclusion that might defeat coverage. When a coverage defense is raised, the interests of the parties are obviously in conflict, and the insurer would normally issue a reservation of rights letter informing the insured that he might want to obtain independent counsel. *See* Fla. Stat. § 627.426(2); *see also* 14 G. Couch, Cyclopedia of Insurance Law § 202:4 (3d ed. 2005). No such letter was sent in this case because USSIC determined early on that no coverage defense would be asserted. (Tr. at 1-117.)

The specific coverage issue here involves an exclusion for losses arising from the ownership, use, maintenance, *etc.* of any "aircraft." (Ex. 151.) "Aircraft" is defined as "a device that is used, or intended to be used, for flight in the air. . . ." (*Id.*)

The airplane involved in the accident was a derelict DC-3 which was being used to salvage parts for the restoration of a C-147.[16] It had been trucked from South Florida to Titusville and had no cockpit, engines, wings or hydraulics. Although the plane was registered with the Federal Aviation Administration, it did not have an airworthiness certificate, and there was no intent by VAC to ever put this plane in flying condition. Rather, its next stop was the smelter. (Tr. at 1-13.)

In September 2005, Burd visited the VAC museum and observed the plane. (Tr. at 1-54:2-19; 1-207-208.) As an experienced pilot, it would have been obvious to Burd that this plane was not being used for flight. And, even a cursory conversation with his client would have made clear

_____

(Tr. at 2-66:21-67:18.)

[16] The C-147 was the military version of a DC-3.

-13-

that VAC had no intention of ever flying this plane.  Thus, the aircraft exclusion was obviously inapplicable and Burd's claim to the contrary is not credible.[17]

Moreover, Burd's conduct does not support his theory that a conflict precluded his representation of USSIC.  The extensive communications between Burd and CTC regarding settlement, claim handling and bad faith, together with the dearth of communication between Burd and VAC, clearly support the existence of a viable tripartite relationship.  The legal advice Burd gave to CTC is simply inconsistent with the notion that VAC was his only client.[18]

## III. Conclusion

Upon consideration of the above, the Court finds that from May 31, 2005 until at least October, 2006, a tripartite relationship existed between USSIC, VAC and Burd.  Although Burd had been hired to represent VAC, the retention letter, together with Copley's handling instructions and Burd's compliance therewith, suggest that Burd's active representation of VAC was deferred until "matters got ugly."  (Ex. 53).[19]  In the meantime, Burd was providing legal advice to USSIC

---

[17] There is no evidence to corroborate Burd's claim that he was concerned about the possibility of USSIC raising this exclusion as a coverage defense.  USSIC never mentioned it, and neither Morris nor Trachtman recall any discussion with Burd about it.  (Tr. at 1-47:24-1-48:8; 1-55:12-15; 1-66:13-18; 2-8:9-23); (*see also* Ex. 70, Haire's June 7, 2005 entry on USSIC's internal computer system reads as follows: "I have reviewed this case with Duane Dyckman of HCC and discussed the potential coverage issue with regard [to] owned aircraft under the premise policy.  He and I both agreed that no reservation of rights letter should be sent and that coverage should not be contested based on this particular policy provision.").

[18] For example, on March 14, 2006, Burd told Copley in an e-mail that "[t]hey seem to be trying to set this up for a bad faith. . . ."  (Ex. 104.)  This concern for USSIC's welfare is not consistent with a lawyer whose only client was VAC.

[19] Matters got ugly in October 2006 when Burd responded to the Payne lawsuit.

and had a duty to do so with reasonable care.  There was no conflict that abrogated that duty and there is no credible evidence that Burd felt constrained by a conflict under these circumstances.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on June 14, 2011.

      GREGORY A. PRESNELL
      UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party